No. 45,688

J. W. HASTAIN, *Appellee,* v. R. R. GREENBAUM, an individual, d/b/a
TIME PETROLEUM COMPANY; and CALIFORNIA-TIME PETROLEUM,
INC., a corporation, *Appellants.*

(470 P. 2d 741)

Opinion filed June 13, 1970.

*Thomas A. Wood,* of Smith, Shay, Farmer and Wetta, of Wichita, argued
the cause and was on the brief for the appellants.

*Richard Jones,* of Hershberger, Patterson, Jones and Thompson, of Wichita,
argued the cause, and *Robert J. Roth* of the same firm was with him on the
brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Plaintiff brought this action to recover on a promis-

sory note. Defendants admitted execution of the note but sought to avoid it by alleging the execution was under duress.

The trial court found the facts were insufficient to sustain the allegation of duress and entered summary judgment for plaintiff for $8,000, the balance due on the note. Defendants appeal from that order.

Defendant R. R. Greenbaum is an individual doing business under the name of Time Petroleum Company; defendant California-Time Petroleum, Inc., is a corporation of which defendant Greenbaum is president and sole stockholder. Hereafter we shall refer to defendants in the singular, either as appellant or Greenbaum.

At the time of rendition of summary judgment the court had before it the depositions of appellee, appellant and a California attorney who represented appellant in connection with the signing of the note in question, together with numerous exhibits. These latter consisted principally of written communications passing between the parties or their agents.

Appellant has conceded the trial court at the time of its ruling had all the available evidence before it which a formal trial would have produced on the issue of duress, and the sole point on appeal is the trial court erred in granting appellee summary judgment because there existed a genuine issue of material fact as to whether appellant executed the promissory note under duress.

The following facts appear from the record: Appellee J. W. Hastain is a lawyer residing at Tulsa, Oklahoma. Appellant Greenbaum, fifty-five years of age, who formerly lived at Wichita, Kansas, but now resides in Beverly Hills, California, has been in the oil and gas business for about thirty years. The two first became acquainted in 1961 when appellee undertook to procure investment participants for appellant in a prospective oil development project in Jamaica. If appellee was successful he was to be paid a specific fee, but nothing materialized in this venture.

At Christmas time, 1965, the two exchanged greetings and letters. Appellee was then suffering from a heart condition. Appellant indicated to appellee his desire to secure additional venture capital so as to enlarge his oil operations and described various plans he had in mind as to raising money and expanding his business. Appellant solicited appellee's services and appellee responded by asking for further detailed information of the project. Eventually appellee agreed with appellant to contact appellee's friend, a Mr. Emby Kaye of Tulsa, and to attempt with Mr. Kaye to find financ-

ing for appellant. Mr. Kay had had wide experience in the oil industry, including financing, and had many contacts with persons interested in oil investments. Compensation was not discussed but both appellee and appellant understood that if appellee should make a deal satisfactory to appellant, appellee would be compensated.

Appellant operated oil properties on the west coast under the name of California-Time Petroleum Company and in the midcontinent field under the name of Time Petroleum Company. Basically, appellant wanted to secure more capital by merging or affiliating with some other company, preferably one on the New York or American stock exchange, or by selling an interest in the companies owned by him and placing the money in a new corporation. Appellant was not contemplating an outright sale of his property but expected to remain in the oil business in a position of control.

During the year 1966 extensive correspondence passed between appellant, appellee and Mr. Kaye. Appellant was advised that to make a deal feasible all of the co-owners of the working oil interests with whom appellant was involved would have to participate. Appellant gave assurance he could deliver substantially all of these working interests. In further response to appellee for information appellant estimated his oil reserves at 14,000,000 barrels. He also advised all the properties owned by him and his participants would be consolidated into one corporation known as California-Time Petroleum, Inc. Appellee and Kaye actively sought possible investors. Kaye met with appellant in New York and also in California with the latter's California attorney. Appellee met in California with appellant. The parties made numerous telephone calls.

On December 20, 1966, Kaye advised appellant his presentation to investors was defective since he had not been provided with an engineering report, indicating that experienced investors want to see substantive reports supported by meaningful figures. March 2, 1967, appellant advised by letter that the oil reserves were evaluated at 6,222,000 barrels, which figure had been reduced to 5,700,000 barrels by the Securities and Exchange Commission.

In late 1966 or early 1967 California-Time Petroleum, Inc., was incorporated. It was a mere shell. On February 9, 1967, the first registration application of California-Time Petroleum, Inc., was filed with the Securities and Exchange Commission. Appellee be-

came aware of this filing. The application contemplated an issue of $4,000,000 of stock to appellant and his co-participants and a stock offering of $5,000,000 to the public. Meanwhile appellee had become dissatisfied and had gone to California to consult with an attorney there about a possible tort action against appellant. However, appellee became ill and did not consult with the attorney. He did advise appellant he would have nothing further to do with the deal.

On March 13, 1967, appellee wrote appellant a lengthy letter setting out his claims and demands. He stated he had wasted a year trying to work something out, having spent all his available time on the project; that appellant had made material misrepresentations of fact upon which appellee, and also Mr. Kaye, had relied to their detriment. These misrepresentations were listed as: Statement by appellant he had reserves of 14,000,000 barrels of oil when he had only 6,000,000 or less; statement he could deliver substantially all his joint venturers who owned oil interests together with him, when he could deliver not more than seventy per cent of them; statement he did not intend to sell his properties when he had offered them for sale all over the country. Appellee indicated other misrepresentation had been made. Appellee also stated he had just learned of Greenbaum's personal involvement in the case of *Jamaica Time Petroleum, Inc. v. Federal Insurance Company,* 366 F. 2d 156. Appellee stated he expected to file suit against appellant for damages in the sum of $300,000 and at the same time attach appellant's Kansas oil runs. Appellee offered to settle his claim for $35,000 provided appellant accepted the offer within seven days. Appellant referred this letter to his California attorney, Mr. Ralph Frank, for handling, telling Frank he would do whatever Frank thought best. On March 24, 1967, Mr. Frank wrote a lengthy reply letter to appellee; he indicated a hard fought lawsuit could have a detrimental effect upon appellee's heart problem; that appellant would vigorously resist appellee's lawsuit; that appellee's filing of a malicious lawsuit could result in loss of the underwriting of the proposed public stock issue before the SEC and exposure of appellee to damages in seven figures; he proposed that all parties sit down and discuss the matter sensibly and straighten out the problems. In April, 1967, appellee went to California again; in a telephone conversation he told appellant that if appellant did not agree to give him a large sum of money, he would go to the SEC

and see to it appellant didn't get a registration of any kind; appellee was still talking about $35,000; appellant characterized appellee's conversation as an irrational tirade. Appellant testified Mr. Frank was handling the matter for him at that time. Appellee met Frank in Beverly Hills. In their discussion little was said about the merits of appellee's claim. Appellee's position was as stated in his March 13, 1967, letter. Appellee stated he had come to California to hire a lawyer and prepare papers for the filing of a million dollar lawsuit involving fraud, which would "fix" appellant and his stock issue. Frank indicated he would charge his client $10,000 to try the case. Appellee still offered to settle his claim for $35,000. Frank advised appellee the filing of the lawsuit would kill the public stock issue.

The next day Frank called appellee and offered to settle appellee's claim for $12,000. Appellee accepted the offer. Several conversations ensued concerning the form of the settlement papers. Frank suggested appellee act as a consultant for the mid-continent area operations upon a fee basis of $1,000 per month for a year. Appellee agreed. It is now conceded the consultant arrangement was actually a subterfuge to shield for tax purposes the amount to be paid in the settlement. Frank delivered to appellee appellant's check dated April 14, 1967, in the sum of $1,000. The back side of the check contained an endorsement prepared by Frank which provided as follows:

"This check payable to James Hastain and accepted by said James Hastain as consideration for one (1) year Consultation Services to California Time Petroleum, Inc. commencing April 15, 1967 to April 15, 1968, and in additional consideration of full and complete release from James Hastain and Mr. Emby Kaye as to California Time Petroleum Inc., R. R. Greenbaum, and any legal entity in which he is a part as to any and all alleged obligations of any kind, type or description payable or due from the aforesaid to James Hastain, Emby Kaye, or any person or legal entity claiming any rights through them. Upon receipt of executed formal releases, approved as to form by Attorney Ralph R. Frank, in favor of aforesaid from James Hastain and Emby Kaye, California Time Petroleum, Inc. shall issue and deliver a $11,000.00 Promissory Note to James Hastain payable monthly commencing May 15, 1967 without interest in consideration of services and release herinabove described."

Appellee cashed the check and returned to Tulsa. Appellee prepared a written release of all his claims against appellant, a contract for consultation services, a disclaimer and release by Mr. Kaye, and a promissory note in the sum of $11,000 and mailed them to Frank on April 17, 1967, for signature by appellant. Not hearing

from Frank for some time after trying unsuccessfully to communicate with him appellee sent Frank a telegram, complaining about not receiving the signed papers back. Appellee talked with Frank by telephone May 13, 1967. Frank stated the note would not be signed because then it would have to be disclosed to the SEC but they were not reneging and appellant would pay the amount agreed upon. Appellee then went to Washington to talk to the SEC. Appellant and Frank did not know appellee was in Washington but on May 15, 1967, while he was there, Frank called appellee's wife and advised the note and other executed copies were being mailed. The executed documents were transmitted by letter dated May 15, 1967.

The note dated April 17, 1967, being the one sued upon, was for $11,000, signed by Greenbaum individually and by California-Time Petroleum, Inc., payable in $1,000 monthly installments commencing May 15, 1967. Besides the initial $1,000 payment to appellee, appellant made three monthly payments of $1,000 each upon the note. Sometime in the summer appellant was unable to obtain a broker to handle the public stock issue. He testified his reason for paying appellee disappeared and he discontinued payments on the note. This suit was subsequently commenced.

Appellant testified that appellee had no exclusive contract with him; that after appellee made his demands appellant considered him irrational and turned the matter over to his California attorney; he thought appellee was trying to blackmail him into paying something which was not due as appellee had not produced; his California attorney recommended he agree to a compromise settlement of $12,000 with appellee; although he did not want to do it he listened to his counsel "as a matter of prudent business judgment" and "went along with it"; he signed the note under duress because appellee was threatening to tell the SEC something but he did not know what; in his conversation with appellee appellant did not inquire as to what appellee was going to tell the SEC and he never did find out; he was not afraid of anything appellee might have been going to tell the SEC but it was a question of causing an investigation and aggravation. The registration statement could have been amended to include appellee's claim. Mr. Frank, who had had considerable experience with SEC registrations, recommended the settlement to appellee because at that time there had been a good response to the proposed registration; he considered appellee's claim to be without merit.

As indicated the sole point urged on appeal is the trial court erred in granting appellee summary judgment because there existed a genuine issue of material fact as to whether appellant executed the promissory note under duress.

K. S. A. 60-256 (c) fixes the standard for determining whether summary judgment should be granted. In pertinent part, it provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In *Meyer, Executor v. Benelli*, 197 Kan. 98, 415 P. 2d 415, we stated:

"The provision for summary judgments (K. S. A. 60-256) was intended to permit a party to pierce the allegation of facts in his opponent's pleadings by affidavits and discovery. The formal issues presented by the pleadings are not controlling." (Syl. ¶ 2.)

The determination of that which constitutes a genuine issue as to any material fact is sometimes difficult. In considering grounds for summary judgment under Federal Rule 56 (c), of which our 256 (c) is a counterpart, in 3 Barron and Holtzoff, Federal Practice and Procedure, rules edition, § 1234, we find this discussion:

"Normally where the only conflict is as to what legal conclusions should be drawn from the undisputed facts, a summary judgment should be entered. [p. 128.] . . . It has been said that an issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail. . . . It has been said that a genuine issue is one which can be maintained by substantial evidence. Where the pleadings or proof of either party disclose that no cause of action or defense exists, a summary judgment may be granted. [pp. 131-132.] . . . A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. [p. 133.] . . . If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied." (p. 134.)

Our cases are in accord with the foregoing statements (Hatcher's Kansas Digest, rev. ed., Permanent Supplement, Volumes 4-6, Summary Judgments, § 3; 6 West's Kansas Digest, 1970 Cum. Annual Pocket Part, Judgment, § 181 [2]).

In 1 Black on Rescission and Cancellation, 2d ed., § 221, we find this definition of duress:

"Duress is a form of coercion, physical or moral, and is said to exist where one person, by the unlawful act of another, is induced to make or discharge

a contract, or to perform or forego some other act affecting his rights of person or property, under circumstances which deprive him of the exercise of his free will, subject him to the will of that other, and constrain him to act contrary to his wishes and inclination." (p. 626.)

In *Vandine v. Vandine,* 171 Kan. 626, 237 P. 2d 224, this court stated:

"To constitute duress there must be a wrongful act or wrongful threat which compels apparent assent by another to a transaction without his volition." (p. 630.)

Whether certain facts actually exist is, of course, ordinarily a question of fact for a jury. But whether the facts offered in a particular case constitute a defense is a question of law. In 5 Williston on Contracts, rev. ed., § 1603, the rule as to duress is stated thus:

"Whether alleged facts, pleaded as constituting duress, existed, if the existence of those facts is denied, is a question for the jury. Whether the alleged facts are sufficient to constitute duress is a question of law." (p. 4497.)

In *Western Paving Co. v. Sifers,* 126 Kan. 460, 268 Pac. 803, the action was one to recover on a promissory note. The defense was that the note was given under duress. The trial court directed a verdict for plaintiff and defendants appealed. This court affirmed, saying:

"The law defines duress. Whether, in a given instance, duress has been exercised is a question of fact. To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment. The evidence to establish duress must be substantial—not merely some evidence—and the court is not obliged to submit to the jury evidence which does not measure up to the required standard of proof.

" 'It would not be proper to simply hold that, merely because a person who has made a contract declares under oath that he was intimidated and acting under fear and duress when the contract was made by him, the contract should by reason of his mere statement be avoided. If that rule were adopted most contracts would be avoided.' (Cornwell v. Anderson, 85 Wash. 369, 375.) [pp. 463-464.]

.  .  .

"This court is committed to the doctrine that in negotiations for settlement of the claim of a person injured by the wrongful conduct of another, it is not duress for the injured person to threaten to use the law to its full extent against the other." (p. 465.)

The court there also quoted approvingly from *Rochester Machine Tool Works v. Weiss*, 108 Wis. 545, 547, 548, 84 N. W. 866, as follows:

"The one really substantial question in the case is whether the court was justified in directing a verdict for the plaintiff. The action was upon an account stated. The defense was duress. . . . When it is perfectly evident from the testimony adduced that there is no foundation for a claim of duress, the court may so decide and take the case from the jury. . . . The parties were several days in looking over their accounts. Mutual claims and allowances were made. The defendant testified that plaintiff's agent told him that he had committed grand larceny, and that he was liable to imprisonment in the state of New York; that he wanted him to get down to a settlement and make it good, or he would have him sent to state's prison in New York for grand larceny; that he (defendant) became nervous, 'and was sweating like the deuce,' and then signed the document. The defendant was apparently a man of intelligence and business experience, thirty-six years of age. He had dealt with plaintiff nine or ten years—had sold their machinery and engines in different parts of the country. To claim that he was imposed upon and put in such fear as to be unable to understand what he was doing looks a great deal like self-stultification. The surrounding circumstances completely negative his claim of duress. Without spending further time in the discussion of the facts, we are satisfied that, upon the defendant's own showing, the court was amply justified in the ruling made." (pp. 466-467.)

Again, in *Jones v. Prickett*, 135 Kan. 640, 11 P. 2d 1008, a note was sought to be avoided on the ground of duress in its execution. The verdict was for defendant. Upon appeal this court set aside that verdict for the reason the evidence presented did not show such duress as would justify nullification of the note, saying:

"We think the full story told by the defendants themselves falls short of meeting the essential requirements of duress. . . .

"We have no evidence as to the state of mind of any of these defendants. We only have their statements that they would not have done so but for the threat. This is not sufficient if they were in fact able to exercise their free will or judgment in the premises." (p. 644.)

In *Gill v. Reveley*, 132 F. 2d 975, Kansas law was applied to a plaintiff's contention that corporate stocks had been obtained by defendants from him at less than fair value by threats of criminal prosecution. At the close of plaintiff's evidence the trial court directed a verdict for defendants. In sustaining this action, the appellate court stated:

"Under the law of Kansas, a threat of criminal prosecution does not constitute duress and will not defeat a contract unless the person to whom the threat was made became so frightened or was placed in such fear as to over-

come his judgment and make it impossible for him to exercise his own free will. [Citations]" (p. 978.)

See also *In re Prima Co.*, 98 F. 2d 952, 965 (7CA).

In 1 Black on Rescission and Cancellation, 2d ed., § 223, we find this discussion of duress as an efficient cause of action taken:

"To establish duress as ground for the avoidance of a contract, conveyance, or other act, it is not alone sufficient to show the exertion of pressure by threats or even by physical compulsion, but it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took. . . . And it is a general rule that a transaction cannot be held to have been induced by duress, notwithstanding any threats which may have been made, where the party had and took an opportunity for reflection and for making up his mind, and where he consulted with others and had the benefit of their advice, especially where he was advised by his counsel." (pp. 630-631.)

Applying the foregoing under the undisputed evidentiary facts in the case at bar, and giving appellant the benefit of all justifiable inferences to be drawn from those facts, we must conclude the evidence before the trial court was insufficient to sustain the defense of duress. Appellant Greenbaum was of mature age with many years' experience in large scale oil and gas business. His testimony and certain letters written by him indicate a vigorous, strong-minded individual with a high degree of astuteness in the area of finance and financial planning. The record contained nothing indicating his will and judgment were dominated by appellee, or that he was totally subjugated and overcome by anything done by appellee. The parties dealt at arm's length. Appellant evinced no real concern as to appellee's possible disclosures to the SEC or their effect. The misrepresentations of fact attributed to appellant in his letter claiming damages were not denied. Whether they were such as to be actionable under all the circumstances is a question of no present concern—at the least a dispute existed. Appellant's counsel indicated the prospect of "a hard fought lawsuit". After considerable discussion it was he who proposed the settlement figure finally agreed upon. Appellant signed the note upon the advice of his own independent counsel. He did not deliver it until more than a month after the settlement was initially negotiated between appellee and his lawyer. Appellant thus had extensive opportunity to reflect on what he was doing. In his own words he signed the note "as a matter of prudent business judgment." He simply made no showing the compromise and

settlement agreement resulted from anything other than the exercise of his own free will. Trial would have been futile and the trial court correctly terminated the matter.

Judgment affirmed.

APPROVED BY THE COURT.